| | | |
|---|---|---|
| **JOSHUA LEE BLACKWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ALAN HOUSER, et al.,** | ) | **ORDER** |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on the following motions: a Motion for

Summary Judgment by Defendant Alan Houser; (Doc. No. 99), a Motion for Summary Judgment

by Defendant John H. Piland, (Doc. No. 101); a Motion for Summary Judgment by Defendant

Judy Humphries, (Doc. No. 103); and a Motion for Summary Judgment by Plaintiff Joshua Lee

Blackwell.

## I.     BACKGROUND

### A.     Procedural Background

Pro se Plaintiff Joshua Lee Blackwell is a North Carolina inmate currently incarcerated at

Tabor Correctional Institution in Tabor City, North Carolina.  Plaintiff filed this action on April

22, 2016, under 42 U.S.C. § 1983, alleging that the moving Defendants were deliberately

indifferent to Plaintiff's serious medical needs while Plaintiff was incarcerated as a pre-trial

detainee at the Lincoln County Detention Center (hereinafter the "Lincoln County jail") in

Lincolnton, North Carolina.  Specifically, in the First Amended Complaint, filed on September

16, 2016, Plaintiff alleges that he received constitutionally inadequate medical care for his right

eye during his confinement in the Lincoln County jail, beginning in December 2015. (Doc. No. 35). Plaintiff alleges his eye needed to be surgically removed, Defendants did not act quickly enough in getting him scheduled for the surgery, and Plaintiff suffered from extreme pain while waiting for the surgery. The record shows that Plaintiff had eye surgery on September 7, 2016. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

The moving Defendants, and the only remaining Defendants in this action, are Lieutenant Alan Houser of the Lincoln County Sheriff's Office, who serves as the Jail Administrator; the jail's physician, John Piland, M.D.; and the jail's head nurse, Judy Humphries. On April 19, 2017, Defendant Houser filed his pending summary judgment motion. (Doc. No. 99). Attached to Houser's summary judgment materials are Houser's own Declaration, along with evidence related to grievances filed by Plaintiff; a Declaration by Houser's counsel Scott MacLatchie, along with excerpts from Plaintiff's deposition of March 23, 2017; and a Declaration by David Carpenter, the Lincoln County Sheriff at all relevant times. On April 21, 2017, Defendant John H. Piland filed his pending summary judgment motion. (Doc. No. 101). Attached to Piland's summary judgment materials are Piland's own Declaration; a Declaration by Dr. Paul Steadman; a Declaration by Defendant Houser, Plaintiff's relevant medical records, and excerpts taken from Plaintiff's deposition of March 23, 2017. Also on April 21, 2017, Defendant Judy Humphries filed her own pending summary judgment motion. (Doc. No. 103). Attached to Humphries' summary judgment materials are Humphries' own Declaration, and Plaintiff's relevant medical records.

On April 24, 2017, and April 26, 2017, this Court entered orders in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could

be submitted to the Court. (Doc. Nos. 105, 106). Plaintiff has filed numerous responses to the summary judgment motions, which include several sworn Declarations, as well as his own summary judgment motion. <u>See</u> (Doc. Nos. 111, 114, 115, 121, 122, 124).

**B.** **Factual Background**

The evidence on summary judgment shows the following:

On December 6, 2015, Plaintiff was transferred from the South Carolina Department of Corrections to the Lincoln County jail on outstanding criminal charges in Lincoln County. The next day, on December 7, 2015, Defendant Nurse Judy Humphries requested Plaintiff's medical records from the South Carolina Department of Corrections. (Doc. No. 103-1 at ¶ 3: Humphries Decl.). When Plaintiff arrived at the jail, he was suffering from a pre-existing condition in his right eye, which was causing him pain. On December 7, 2015, pursuant to medication orders from South Carolina, Plaintiff was provided medication for his right eye, including Tramadol, Tetracaine, Phenylephrine, Latanoprost, Prednisone, and Atropine. (<u>Id.</u> at ¶ 3; Doc. No. 103-1 at 12-14: Def. Humphries' Ex. A). Plaintiff continued to receive these medications until April 4, 2016, when Plaintiff was sent to Central Prison for safekeeping to receive treatment for his eye. <u>See</u> (<u>Id.</u>). Additionally, Plaintiff was given Tylenol twice a day for pain, beginning on December 8, 2015, and through April 4, 2016.

On December 8, 2015, two days after entering the jail, Plaintiff submitted a Facility Employee Request to Defendant Houser, stating that there was a possible cancerous growth on his right eye for which South Carolina prison staff had recommended the eye be surgically removed. (Doc. No. 99-1 at ¶ 6: Houser Decl.; Doc. No. 99-1 at 17: Ex. 4 to Houser Decl.). The Request did not mention Plaintiff being in pain. Houser responded to Plaintiff within one hour, stating: "I will forward this request to the medical staff. Our medical staff will go through the

steps needed; they will get your records from South Carolina so that our Doctor and medical staff can follow up on what is needed." (Id.).

Houser immediately shared this information with Nurse Humphries via email. On December 10, 2015, Plaintiff sent Houser another Facility Employee Request, stating his belief that the jail's medical staff would be unable to "diagnose" his problem and that he should see an ophthalmologist instead. (Doc. No. 99-1 at p. 17). This Request also did not mention pain. Houser responded to Plaintiff within ninety minutes, informing him that his request had been turned over to medical. (Id.). Houser then sent Nurse Humphries a second email relaying Plaintiff's concerns. (Doc. No. 99-1 at ¶ 6). The December 8 and December 10 requests were the only two times Plaintiff ever sent Houser a kiosk communication concerning medical care for his eye. (Id.; see also Doc. No. 99-2 at pp. 6-8, 11 (pages 31:23-32:23 & 81:2-8 of deposition transcript) (where plaintiff acknowledged that he recalled only the two kiosk communications to Houser, and one verbal conversation on December 21, 2015)).

On December 17, 2015, Houser placed Plaintiff on "medical lockdown" after hearing from several detention officers that Plaintiff was complaining about his eye. (Doc. No. 99-1 at ¶ 7). Houser explains that an inmate on medical lockdown is housed in a single cell and is not allowed to interact with other inmates, although he still receives daily recreation time out of the cell if the medical condition permits. Houser took this action because he had already observed Plaintiff wearing sunglasses inside the jail, and he was told that Plaintiff had complained about walking upstairs at the courthouse because he could not see the steps due to the sunglasses. Houser was also told that Plaintiff had been going upstairs in the cell block with his sunglasses on and was also performing handstands on tables in the dayroom. After reviewing video recordings confirming this, Houser elected to place Plaintiff on medical lockdown for his own

safety until he could confer with medical staff about the propriety of housing him with the general population.

Plaintiff submitted a kiosk grievance about the lockdown, stating that he had been blind in his right eye since age 15 and was not locked down during his previous incarcerations. (Id. at ¶ 8 & Ex. 5).[1] This was the first time Houser learned of Plaintiff's right eye blindness. Houser went back through Plaintiff's medical screening forms and confirmed that none of them mentioned blindness. According to Houser, this revelation heightened Houser's concern for Plaintiff's safety. (Id.).

After Plaintiff submitted another series of grievances questioning why he was on medical lockdown, Houser had him brought to the intake area on December 21, 2015, to explain why the decision was made. (Id. at ¶ 9; see also Doc. No. 99-1 at p. 21: Ex. 6 to Houser Decl.). Houser essentially told Plaintiff that because he was complaining that his eye was getting worse and needed specialized medical attention, Houser could not place him with the general inmate population until he was cleared by medical staff. (Doc. No. 99-1 at ¶ 7). When Plaintiff became argumentative, Houser and another detention officer placed him in an adjacent holding cell, known as the "rubber room," while Houser typed up the response to his grievance. Because of Plaintiff's demeanor, Houser gave him one push from behind towards the cell when it appeared he was not going to comply. Plaintiff filed a grievance over the push, but it untimely, as it was filed more than ten days later, on January 18, 2016. (Id. at ¶ 9; see also Doc. No. 99-1 at p. 23: Ex. 7 to Houser Decl.). Medical staff approved taking Plaintiff off lockdown the following day, and he was returned to the general population. (Doc. No. 99-1 at ¶ 10).

---

[1] Plaintiff testified at his deposition that he lost sight in his right eye when shot with a crossbow at around age 16. (Doc. No. 99-2 at p. 6 (page 14:2-7 of deposition transcript)).

Houser states in his Declaration that, after his conversation with Plaintiff in the intake area on December 21, 2015, Plaintiff never again complained to Houser about his eye. (Doc. No. 99-1 at ¶ 11). Houser asserts that he is aware of only a few occasions later on when Plaintiff declined his scheduled law library time supposedly because his eye hurt. Houser asserts that, even on those occasions, however, Plaintiff still proceeded to recreate and play cards with other inmates, showing no signs of impairment. Finally, Houser asserts that the next time after December 2015 that Houser became involved with any aspect of Plaintiff's eye care was in late March 2016, medical staff instructed Houser to arrange Plaintiff's transportation to the Graystone Eye clinic in Hickory for an appointment on or about April 1. (Id. at ¶ 12).

On January 4, 2016, Defendant Piland, the jail doctor, examined Plaintiff and prescribed him Neurontin/Gabapentin, which Plaintiff then received daily through April 4, 2016. (Doc. No. 103-1 at ¶ 4; Doc. No. 103-1 at p. 16: Ex. A to Humpries Decl.). On January 12, 2016, Plaintiff reported to Nurse Humphries that the Neurontin was helping and Dr. Piland increased the dosage that same day. On February 1, 2016, Plaintiff again saw Dr. Piland. (Doc. No. 103-1 at ¶ 4; Doc. No. 103-1 at p. 22). Nurse Humphries subsequently arranged for Plaintiff to see an eye doctor due to the continuing concern for his eye. On March 31, 2016, jail staff transported Plaintiff to see Dr. Roderick Hargrove, an eye doctor at Graystone Eye Care. (Doc. No. 103-1 at ¶ 5; Doc. No. 103-1 at pp. 29-31). After discussing treatment options with Plaintiff, Plaintiff opted for eye surgery, but no surgery was scheduled that day, nor did Graystone Eye document an urgent need for the surgery. See (Id.).

At some point after Plaintiff's return to the jail, medical staff asked him to obtain a "safekeeping" order, allowing Plaintiff to be transferred to the Safekeeping Unit at Central Prison in Raleigh pending further medical intervention for his eye. On or about April 5, 2016,

Plaintiff was transferred to Central Prison in Raleigh for safekeeping to receive treatment for his eye.[2] (Doc. No. 99-1 at ¶¶ 5, 12; Doc. No. 99-1 at p. 25: Ex. 8 to Houser Summary Judgment Motion).

Plaintiff remained in Central Prison's Safekeeping Unit until his return to the Lincoln County jail on May 17, 2016, after a Central Prison employee erroneously told someone on Houser's staff that Plaintiff was ready to be picked up. (Doc. No. 99-1 at ¶ 13). After Plaintiff arrived back at the jail, Houser learned that Plaintiff had not received the anticipated eye surgery. Central Prison was immediately called and acknowledged their mistake in releasing Plaintiff. Houser obtained a new safekeeping order on May 18, 2016, and Plaintiff was sent back to Central Prison the same day. (Id.; Doc. No. 99-1 at p. 28: Ex. 9 to Houser Summary Judgment Motion). Following the medical orders that were provided for Plaintiff, Plaintiff was given one dose of Gabapentin before he was returned to Central Prison. (Doc. No. 103-1 at ¶ 6).

On June 27, 2016, Central Prison's Safekeeping Unit informed Houser that Plaintiff was ready for return to Lincoln County pending a surgical appointment opening up with the Duke Eye Center sometime before September 22, 2016. (Doc. No. 99-1 at ¶ 14). After Houser confirmed that his staff would be notified as soon as the surgery was scheduled, Plaintiff was returned to the jail on that same day. That same day, following medical orders from the North Carolina Department of Public Safety, Plaintiff began receiving various medications, including Gabapentin, Atropine Sulfate, Prednisone, and Venlafaxine. (Doc. No. 103-1 at ¶ 7; Doc. No. 103-1 at pp. 90-93). Houser discussed the planned surgery with Plaintiff when he arrived back at

_____

[2] Plaintiff filed his original Complaint in this action on April 22, 2016, while he was at Central Prison being held in safe-keeping, about five months after he first arrived at the Lincoln County jail.

the jail that day.[3]  (Doc. No. 35 at ¶ 25).

On July 14, 2016, Plaintiff submitted a Medical Request to the jail's medical staff stating that he was in pain and needed to see Dr. Piland.  (Doc. No. 103-1 at ¶ 8).  On around July 15, 2016, Houser became aware that Plaintiff had filed this lawsuit, and he immediately went to see Nurse Humphries because of Plaintiff's allegations about lack of medical care for his eye.  (Doc. No. 99-1 at ¶ 15).  Humphries assured Houser that Dr. Piland was monitoring the situation, and that Plaintiff was still on track for eye surgery.

On July 16, 2016, Dr. Piland and Nurse Humphries saw Plaintiff pursuant to his medical request.  (Doc. No. 103-1 at ¶ 8).  Dr. Piland ordered for Plaintiff to receive additional Neurontin and Tylenol to treat eye pain.  (Id.).  These drugs were provided to Plaintiff, and additionally, Dr. Piland referred Plaintiff to be seen at Central Prison or Graystone Eye for further treatment. (Id.).  Around this same time, on July 27, 2016, an inmate informed jail nurse Haley Hester that Plaintiff was hoarding and giving away his medications.  (Id. at ¶ 9).  That same day, during the night medication distribution, Plaintiff informed a staff nurse that he was not in pain.  (Id.).

In early August 2016, at the request of medical staff, Houser made arrangements for Plaintiff to be driven back to Graystone Eye for another appointment, held on August 8, 2016. (Doc. No. 99-1 at ¶ 16; Doc. No. 103-1 at ¶ 10).  After that appointment, Plaintiff's eye surgery was scheduled for about a month later, on September 7, 2016, at Graystone Eye.  (Id.).  Because of the surgeon's request that Plaintiff not be allowed to eat or drink anything after midnight before his surgery, he was moved into the rubber room off the intake area the evening of September 6, 2016.  (Doc. No. 99-1 at ¶ 16).  Plaintiff was driven to Graystone Eye early the

_____

[3]  This is the last conduct ascribed to Houser throughout Plaintiff's entire factual narrative in the First Amended Complaint.

next morning, his eye surgery was performed, and he was then returned to the jail. (Id.).

Plaintiff was placed in a cell with a hospital bed to maximize his comfort and safety, and Nurse

Humphries stayed at the jail overnight to periodically check on him and administer pain

medication. (Id. at ¶ 16).

On September 15, 2016, Plaintiff was taken for post-surgical follow-up on his eye. (Doc.

No. 103-1 at ¶ 12). Following the surgery, Plaintiff reported to Dr. Hargrove that he was

experiencing no more pain in the eye and only had soreness. (Id.). Furthermore, after Plaintiff's

recovery from the surgery, he did not report any pain in his right eye to Nurse Humphries or to

Houser. (Id.; see also Doc. No. 99-1 at ¶ 17). Plaintiff further acknowledged in his deposition

that the surgery went so well that he has been pain-free since one week after the surgery, and he

remains pleased with the cosmetic result. (Doc. No. 99-2 at pp. 11-13, 16 (pages 91:8-92:6 &

125:1-8 of deposition transcript).

On January 12, 2017, Plaintiff was returned to state custody for safekeeping purposes

after he complained that his cell mate was a "snitch" and he no longer felt safe in the Lincoln

County jail. (Doc. No. 99-1 at ¶ 17). Except for two brief returns to the jail to meet with his

criminal attorney and attend court, Plaintiff has remained in state custody ever since.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id.

10

In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524).

The Lincoln County jail's grievance procedure, which is available for review on the jail's kiosk system, affords inmates ten days in which to submit a grievance, after which a supervisor is to respond within five working days. (Doc. No. 99-1 at ¶ 4 & Doc. No. 99-1 at p. 13: Ex. 2 to Houser Decl.). If the inmate is dissatisfied with the supervisor's response, he may appeal the response through the kiosk within 24 hours. (Id.). All grievance appeals are electronically routed to Houser as Jail Administrator. (Id.).

The undisputed evidence before the Court is that Plaintiff only ever sent Houser two kiosk requests seeking medical care for his eye, to which Houser immediately responded.[4]

---

[4] There is at least one kiosk in each housing area throughout the jail. (Doc. No. 99-1 at ¶ 6). Inmates using the kiosk system are provided screen options as to where they wish to direct their

Moreover, these were labeled as requests, not grievances, and were submitted within Plaintiff's first four days in the jail in December 2015. Although Plaintiff filed numerous other grievances on various issues during his time in the jail that began on December 6, 2015, it was not until December 11, 2016, over one year later, that he filed his first grievance appeal. That was over a medical issue unrelated to his eye. (Doc. No. 99-1 at ¶ 5; <u>see also</u> Doc. No. 99-2 at p. 9 (page 43:19-25 of deposition transcript) ("Q. Well, just to clarify, you never appealed the jail's response to any of the grievances about your eye care, did you? A. My grievances to my eye care? Yes, of course I did. I—I didn't appeal it, but there was—I constantly told them, look, I need eye care, my eye's bad, you know.")).

Plaintiff's failure to appeal his grievances means Plaintiff never fully exhausted his available administrative remedies at the Lincoln County jail before filing this lawsuit asserting lack of proper medical care for his eye.[5] <u>See</u> <u>McLean v. Shelton</u>, No. 3:11-cv-01535-AC, 2013 WL 3994760, at *5 (D. Ore. Aug. 2, 2013) (stating that although an inmate is not required "to repeatedly exhaust claims of ongoing inadequate medical care," he must have at least one "fully-exhausted grievance[]"). Plaintiff's claim asserting that Houser retaliated against him "with violence" for filing grievances is similarly barred. Although Plaintiff filed a grievance accusing Houser of assaulting him on December 21, 2015, it was untimely, as it was filed more than ten

_____

staff communication. The primary screen is labeled Resident Request Report, and inmates check a box to label their communication from options such as Facility Employee Request, Facility Employee Grievance, Medical Request, or Medical Grievance. Houser does not review requests sent to medical staff unless the inmate appeals the staff's response to a grievance.

[5] Although Plaintiff testified that he verbally complained to medical staff about his eye rather than appeal, this "does not satisfy the exhaustion requirement because the administrative grievance process permits only written grievances." <u>McNair v. Sgt. Jones</u>, No. 01-cv3253, 2002 WL 31082948, at *7 (S.D.N.Y. Sept. 18, 2002).

days later on January 18, 2016.  (Doc. No. 99-1 at ¶ 9; Doc. No. 99-1 at p. 24).

Here, despite that Plaintiff admitted in his deposition that he did not appeal his grievances related to his eye problems, he now contends for the first time, in response to the summary judgment motions, that there was no method for appealing his grievances during the relevant time period.  Specifically, Plaintiff contends that he could not appeal his grievances during his first year at the jail because the jail's kiosk system never displayed an "appeal box to click on." (Doc. No. 110-1 at pp. 39-40, ¶¶ 3-4).  To the extent that Plaintiff claims there was no method for appealing grievances, this Court finds Plaintiff's allegation to be not credible and to be inconsistent with the evidence on summary judgment, in which Defendant Houser has submitted the following statement regarding the process for appealing grievances at the jail:

> I am informed and believe that Blackwell testified at his recent deposition he wanted to appeal many of his grievances throughout his time in custody but was unable to do so because the kiosk screen lacked an appeal tab.  That is simply not true.  First, all grievances may be appealed. Once the grievance is responded to by detention or medical staff, an inmate wishing to appeal the response needs only to touch the "Appeal" tab off to the right.  Second, other inmates managed to submit numerous grievance appeals using the kiosk system throughout the entirety of 2016. It is also notable that despite my frequent direct contact with Blackwell during his time in custody, he never once told me that he was having trouble submitting appeals, nor did he ever submit a written grievance to that effect.

(Doc. 99-1 at p. 3, ¶ 5) (citation to exhibit omitted).  Moreover, as Defendant Houser notes, when asked at deposition specifically whether he had appealed any of the grievances concerning his eye, Plaintiff admitted "I didn't appeal," but "I constantly told them, look, I need eye care, my eye's bad, you know."  (Doc. 99-2 at p. 9).  In sum, the evidence on summary judgment shows that Plaintiff failed to exhaust his administrative remedies as to his deliberate indifference claim against the moving Defendants.  Thus, Defendants are entitled to summary judgment on this basis alone.

**B.  Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs As to Defendants in their Individual and Official Capacities**

The Court further finds that, even if Plaintiff exhausted his administrative remedies before filing this action, Defendants are nevertheless entitled to summary judgment on the merits of Plaintiff's deliberate indifference claim against Defendants in both their individual and official capacities.

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment.[6]  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate.  Id.  "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."  Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted).  "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

---

[6] Because Plaintiff was a pre-trial detainee at all relevant times, his deliberate indifference claim is properly brought under the Fourteenth Amendment, rather than the Eighth Amendment, but the analysis is the same.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment).  This Court observes that even if the Fourth Circuit were to apply to pre-trial detainees' deliberate indifference claims the Kingsley v. Hendrickson "objective unreasonableness" standard that currently applies to pre-trial detainees' excessive force claims and apply that standard to deliberate indifference claims, Plaintiff has still not presented sufficient evidence to withstand Defendants' summary judgment motions.

fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

First, to the extent that Plaintiff has sued Defendants in their official capacities, a local government may be held liable under 42 U.S.C. § 1983 only if the plaintiff proves a "policy or custom" of the entity was a moving force behind a violation of constitutional rights. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978). As to Defendant Houser, a suit against Defendant Houser in his official capacity is a claim against Houser's local government

15

employer, Lincoln County Sheriff David Carpenter. Thomas v. Holly, No. 5:10-cv-52-BO, 2010 WL 3063205, at *2 (E.D.N.C. Aug. 4, 2010) ("official capacity claims against the deputy sheriffs are claims against the Sheriff"). The First Amended Complaint does not allege, however, that Plaintiff's constitutional rights were violated pursuant to an unlawful policy or custom of the Sheriff's Office. Generally, the failure to allege a specific policy or custom is fatal to an official capacity claim against a government unit such as the Sheriff's Office. See Alvarez v. Corr. Med. Servs., Inc., Civ. No. WDQ-10-179, 2015 WL 7012654, at *5 (D. Md. Nov. 12, 2015).

Furthermore, Lincoln County Sheriff David Carpenter has submitted a Declaration, stating that it is his policy that inmates "are to be adequately and humanely cared for[,]" which "includes the receipt of reasonable medical care." (Doc. No. 99-3 at ¶ 4: Carpenter Aff., Ex. C to Houser's Summary Judgment Motion). Sheriff Carpenter further declares that, while Plaintiff was in the Lincoln County jail, "there was no policy or custom which permitted jail staff to ignore an inmate's serious medical needs, nor would I ever approve of such a policy or custom. Hypothetically speaking, if an inmate's serious medical needs were to ever be ignored, that would violate, rather than represent, my policy." (Id.). Similarly, as to Defendants Humphries and Piland, Plaintiff has simply not alleged that his constitutional deprivations were the result of some policy or custom of Lincoln County. Thus, Plaintiff's official capacity claim against the moving Defendants fails.

Next, to the extent that Plaintiff has sued the moving Defendants in their individual capacities, he has not raised a genuine dispute of fact as to his deliberate indifference claim to

overcome Defendants' summary judgment motions.[7]  First, as to Plaintiff's claim against Houser, the undisputed facts show that Defendant Houser was not deliberately indifferent to Plaintiff's medical needs—and, in fact, Houser assisted in a timely manner with Plaintiff being evaluated and treated by outside ophthalmologists.  As noted, Defendant Houser received only two kiosk requests from Plaintiff requesting medical care for his eye during the entire 13-month period Plaintiff was in and out of the Lincoln County jail.  Both times Houser immediately emailed the jail's head nurse Defendant Humphries to make her aware of Plaintiff's concerns.  Beyond that, Plaintiff conveyed his concerns about his eye to Houser just one time, and that was during a face-to-face meeting fifteen days after he first entered the jail, in December 2015.

Plaintiff now contends, in his sworn Declaration in opposition to Houser's summary judgment motion, that he submitted requests and grievances about his eye to Houser "on numerous occasions."  (Doc. No. 110-1 at p. 41).  This statement, however, directly contradicts Plaintiff's deposition testimony, in which Plaintiff was questioned about the above two kiosk messages that he sent to Houser, and he was asked to confirm that "whenever you communicated with Houser about your eye you did so through the kiosk?"  Plaintiff answered "Yeah," and he immediately added there was "one time," specifically December 21, 2015, that he also verbally complained to Houser about his eye.  (Doc. No. 99-2 at pp. 7-8) (pages 31:23-32:23 of deposition transcript).  Notably, Plaintiff later re-confirmed he could not recall sending Houser any more than the two kiosk messages about his eye.  (Doc. No. 99-2 at p. 11) (page 81:2-8 of deposition transcript) (acknowledging that he was "not sure" to whom he directed any further

---

[7]  Furthermore, to the extent that Plaintiff seeks injunctive and declaratory relief against Defendants, his claims are moot because he has been transferred away from the Lincoln County jail.

kiosk messages about his eye)).

Under the "sham affidavit" doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999). Absent Plaintiff's latest statement in opposition to Houser's summary judgment motion that submitted requests and grievances about his eye to Houser "on numerous occasions," he is left with his deposition testimony that he is "unsure" about the recipient(s) of any kiosk communications beyond his first two messages to Houser. Plaintiff's uncertainty is facially insufficient to overcome Houser's assertion that he only ever received those two messages. See English v. Pabst Brewing Co., 828 F.2d 1047, 1050 (4th Cir. 1987) (plaintiff's affidavit stating his employer had not posted information on the ADEA of which he "was aware" held insufficient to defeat employer's motion for summary judgment supported by testimony the information was in fact posted).

Finally, the fact that, in opposing the summary judgment motions, Plaintiff has submitted declarations by other prisoners in which the prisoners attest that Plaintiff was suffering from eye pain in the jail while waiting for his eye surgery, does not negate that the evidence shows that Plaintiff complained to Houser about his pain *only* through the two kiosk communications and the single face-to-face in the jail's intake area of December 21, 2015. On these facts, Plaintiff has simply not shown that Houser was deliberately indifferent to Plaintiff's eye care needs, particularly when Houser repeatedly arranged transportation for Plaintiff to see eye specialists both locally and in Raleigh through Central Prison's Safekeeping Unit. Indeed, Plaintiff has submitted as one of his exhibits in opposing the summary judgment motion a safekeeping order dated April 4, 2016, directing Plaintiff to be transferred to Central Prison's safekeeping unit, in

which Defendant Houser stated in the request that Plaintiff

> was seen by Graystone Eye, per Graystone his body is now rejecting his eye, and
> he has a mass behind his right eye. This patient is in extreme pain and is
> requiring surgery immediately. The Lincoln County Detention Center medical
> staff does not have 24 hour care. We are asking that he be committed to Sage
> Keeping at the N.C. Dept. of Corrections in Raleigh N.C., [as the Lincoln County
> Detention Center] is not equipped to handle an acute medical problem such as
> this.

(Doc. No. 114-1 at p. 74).[8]  Houser's statement in the safekeeping order only confirms that he

was diligently working on Plaintiff's behalf to get Plaintiff scheduled for surgery as soon as

possible.   As discussed, <u>supra</u>, the evidence shows that, between December 2015 and late March

2016—when medical staff told Houser to arrange for Plaintiff's transportation to the Graystone

Eye Clinic—Houser was not alerted to the need to refer Plaintiff for further treatment.  Thus, as

Defendant notes, Houser's attempts to get Plaintiff transferred to state custody for more

advanced care and medical evaluation as soon as Houser was made aware of Plaintiff's need for

more care demonstrate the *opposite* of deliberate indifference.

    In sum, the evidence on summary judgment shows that Defendant Houser diligently

attempted to get Plaintiff to a facility that had the capacity to meet his medical needs, and Houser

cannot be held responsible for any subsequent delays by Central Prison and/or Graystone in

scheduling Plaintiff's eye surgery.  It is well settled that a jail official's "failure to take further

action once he had referred the matter to the medical providers can[not] be viewed as deliberate

indifference."  <u>Greeno v. Daley</u>, 414 F.3d 645, 655-56 (7th Cir. 2005).  <u>See also</u> <u>Daniels v.</u>

<u>Benston</u>, No. 5:13-CT-3286-FL, 2016 WL 270218, at *6 (E.D.N.C. Jan. 21, 2016) (stating that

"non-medical prison officials are entitled to rely on the judgment of medical personnel as to the

---

[8]  An almost identical safekeeping order was submitted and dated May 18, 2016.  <u>See</u> (Doc. No.
114-1 at p. 75).

appropriate medical treatment of inmates"). This is especially true where, as here, the jail official also knows the inmate is being seen by outside specialists. See, e.g., Vallade v. Fischer, No. 12-cv-231M, 2012 WL 4103864, at *6 (W.D.N.Y. Sept. 13, 2012) (given that inmate plaintiff "was in fact referred to and seen by an outside specialist, his allegations against [prison medical staff] amount at most to plaintiff's disagreement with the treatment received, or a delay in treatment," falling short of deliberate indifference).

Nor can Houser be held responsible for the fact that officials at Central Prison mistakenly returned Plaintiff to the jail in June 2016 before Plaintiff had received his eye surgery. Moreover, by Plaintiff's own allegations, when Plaintiff was mistakenly returned to the jail, Houser responded by telling Plaintiff he knew Plaintiff was "hurting," that he (Houser) was trying "everything he could" to get the surgery scheduled, and that he (Houser) was sorry. (Doc. No. 114-1 at pp. 15-16). Plaintiff has further admitted that efforts were already underway to get the surgery scheduled for a date between then and September 22, 2016. See (Doc. No. 114-1 at p. 15; see also Doc. No. 99-1 at ¶ 14). In sum, Plaintiff has presented no evidence that Houser was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," or that he ever "dr[e]w the inference." Farmer v. Brennan, 511 U.S. at 837. There is therefore no genuine issue of disputed facts as to whether Defendant Houser was deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff also alleges in the First Amended Complaint that Houser retaliated against him "with violence" for filing grievances. (Doc. No. 35 at ¶ 33). Although Plaintiff alleges the medical lockdown in December 2015 was retaliatory, (Doc. No. 35 at ¶ 16), he does not allege any associated act of physical "violence." The reference to "violence" in paragraph 33 may refer to the single push he received from Houser on December 21, 2015, when Houser perceived

20

Plaintiff was not moving towards a holding cell as ordered. (Id. at ¶ 9). If so, the single push from Defendant Houser is categorically beneath the level of unconstitutional excessive force. See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015) (holding that a pretrial detainee asserting an excessive force claim must demonstrate "that the force purposely or knowingly used against him was objectively unreasonable"); see also Graham v. Connor, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" qualifies as excessive force). Furthermore, to the extent that Plaintiff purports to raise a claim of retaliation rising to the level of a First Amendment violation, Plaintiff's conclusory allegations are wholly insufficient to state a First Amendment retaliation claim.

Next, as to Defendant Humphries, the undisputed facts show that Defendant Humphries was also not deliberately indifferent to Plaintiff's medical needs. She, in fact, provided proper medical treatment and assisted with Plaintiff being evaluated and treated by outside ophthalmologists. As a nurse, Humphries cannot prescribe medications to or make referrals for inmates. (Doc. No. 103-1 at ¶ 2). Instead, she follows doctors' orders regarding inmate treatment. (Id.). Throughout Plaintiff's stay at the jail, Nurse Humphries and the other medical staff promptly and properly responded to Plaintiff's complaints and medical requests, including ensuring that doctors' orders regarding Plaintiff were followed. For instance, throughout his stay at the Lincoln County jail, Plaintiff received medication for his right eye, including medication for pain. (Doc. No. 103-1 at ¶¶ 3-4, 6-7, 10-11 & Ex. A). Furthermore, Humphries ensured that Plaintiff saw Dr. Piland and an eye doctor multiple times while Plaintiff was at the jail. (Id. at ¶¶ 4-5, 8, 10-12 & Ex. A).

Plaintiff has also failed to show that he actually suffered an injury caused by Defendant Humphries' conduct. It is well established that a delay in medical care without resulting injury

does not violate the Eighth Amendment.  See Strickler v. Waters, 989 F.2d 1375, 1380-81 (4th Cir. 1993).  The evidence on summary judgment shows that, before coming to Lincoln County jail on December 6, 2015, Plaintiff had ongoing chronic issues with his right eye stemming from an accident in his youth.  In this action, Plaintiff complains of experiencing pain from his eye, which he was experiencing before his incarceration at the jail.  Further, there is no evidence to support Plaintiff's allegations that Nurse Humphries' treatment caused the pain in Plaintiff's eye, nor has Plaintiff produced any evidence on summary judgment to show that any conduct by Defendant Humphries prolonged Plaintiff's eye pain unnecessarily.  As noted, Defendant Humphries could only follow the doctors' orders—she had no control over how quickly Plaintiff's eye surgery was scheduled.  Finally, as noted, Plaintiff has admitted that, since having his eye surgery in September 2016, he has had no further issues with his eye and he is happy with the outcome.  In sum, Plaintiff's claims cannot meet the high burden necessary to establish deliberate indifference to Plaintiff's serious medical needs as to Defendant Humphries.

Finally, as to Plaintiff's claim against Dr. Piland for deliberate indifference to serious medical needs, Dr. Piland is also entitled to summary judgment as to this claim.  That is, Plaintiff has failed to present any evidence that Dr. Piland's treatment was inadequate, much less deliberately indifferent to his medical needs.  Plaintiff has presented no evidence on summary judgment showing that Dr. Piland ignored or refused to treat Plaintiff's symptoms.  Indeed, the medical records show that Dr. Piland repeatedly provided Plaintiff with eye drops and pain medication.[9]  See Estelle, 429 U.S. at 105-06.  Additionally, Dr. Piland referred Plaintiff twice to

_____

[9]  Plaintiff's allegations against Dr. Piland appear to amount to nothing more than a disagreement as to the appropriate manner of treatment, which, as a matter of law, does not rise to the level of a constitutional violation.  For instance, Plaintiff alleges that another medical doctor opined that Dr. Piland should not have been treating Plaintiff with the eye drops Dr. Piland had been

22

Graystone Eye for evaluation and treatment, which ultimately resulted in the successful removal of Plaintiff's right eye. Plaintiff has presented no evidence showing that any alleged delay in treatment by Dr. Piland adversely affected Plaintiff's health. Finally, Dr. Paul Steadman, a doctor who treats inmates at prison facilities, has submitted a Declaration in support of Defendants' summary judgment, opining that both Nurse Humphries and Dr. Piland provided Plaintiff with appropriate medical treatment that met the standard of care. (Doc. No. 101-2 at ¶ 12). Furthermore, Dr. Steadman has opined in his Declaration that Plaintiff's eye condition was chronic and was never an emergent or urgent situation. (Id. at ¶ 7).

In sum, for the reasons stated herein, the Court finds that Plaintiff did not exhaust his administrative remedies before filing this action. The Court further finds that, even if Plaintiff had exhausted his administrative remedies, his claims against the moving Defendants would nevertheless be subject to dismissal on the merits because Plaintiff has failed to raise a genuine factual dispute sufficient to overcome Defendants' summary judgment motions. Plaintiff is clearly dissatisfied with the speed with which he obtained his eye surgery, but he has simply not shown that the moving Defendants were deliberately indifferent to his serious medical needs, including the need for eye surgery, or that Defendants' conduct was the reason for any alleged delay in obtaining his eye surgery.

IV.     CONCLUSION

In sum, for the reasons stated herein, the Court grants the summary judgment motions by

---

prescribing because the drops "had put toxins into the eye and my system." See (Doc. No. 35 at p. 14). Plaintiff, however, has produced no evidence showing that Dr. Piland's method of treatment harmed Plaintiff. Indeed, even if Plaintiff could show that Dr. Piland's treatment amounted to medical malpractice, which he cannot, this is not enough to establish a constitution violation based on deliberate indifference to medical needs.

Defendants.  To this extent, Plaintiff's own summary judgment motion is denied.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motions for Summary Judgment, (Doc. Nos. 99, 101, 103), are all **GRANTED**, and this action is dismissed without prejudice for failure to exhaust administrative remedies.  Alternatively, Plaintiff fails to state a claim for deliberate indifference against the moving Defendants.  Thus, Plaintiff's deliberate indifference claim against the moving Defendants is denied and dismissed alternatively on the merits.  Furthermore, to the extent that Plaintiff purports to bring a First Amendment claim against Defendant Houser, this claim is also dismissed alternatively on the merits.

2. Plaintiff's Motion for Summary Judgment, (Doc. No. 111), is **DENIED**.

3. The Clerk is respectfully instructed to terminate this action.

Signed: October 18, 2017

Frank D. Whitney
Chief United States District Judge